# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

LIMITED BRANDS, INC.,
    et al,

        Plaintiffs,

                          Case No. C2-04-632
vs.                     Judge Edmund A. Sargus, Jr.
                          Magistrate Judge Terence P. Kemp

F.C. (FLYING CARGO) INT'L
TRANSPORTATION LTD.,
    et al.,

        Defendants.

## OPINION AND ORDER

This matter is before the Court on the Motion to Dismiss or in the Alternative Motion to Transfer filed by Defendant, Palmer Industries, Inc., and the Motions for Summary Judgment filed by Defendant, F.C. (Flying Cargo) International Transportation Ltd. and Defendant Cargo Connection Logistics Corporation. Plaintiffs, Limited Brands Inc., Mast Industries, Inc. and Victoria's Secret Stores, Inc., oppose the Motions. For the reasons that follow, Palmer's Motion to Dismiss is granted; Cargo Connection's Motions for Summary Judgment is granted; Flying Cargo's Motion for Summary Judgment is denied.

### I.

**A.**    **The Parties and Shipment**

Plaintiffs, Limited Brands, Inc., Mast Enterprises, Inc. and Victoria's Secret Stores (collectively "Plaintiffs") are Delaware Corporations with their principal places of business in

Franklin County, Ohio. Mast Enterprises is a subsidiary of Limited Brands and arranges for the manufacture of goods that it sells to Limited Brands' entities. Mast arranges for the delivery of the manufactured goods to Columbus, Ohio.

In 2003, Mast purchased certain goods from Delta Galil Industries Ltd., located in Tel Aviv, Israel, which Mast subsequently sold to Victoria's Secret, also a Limited Brands' subsidiary. On or about May 21, 2003, Plaintiffs contracted with Defendant, F.C. (Flying Cargo) International Transportation Ltd. ("Flying Cargo"), for the shipment of 596 cartons of garments ("Shipment" or "Merchandise") from Israel to Columbus, Ohio.[1] Flying Cargo hired its affiliate, Danmar Lines, to arrange for the carriage of the Merchandise.[2] Danmar accepted the merchandise for carriage and issued a Master Waybill, and freight Bills of Lading, consecutively numbered HFACMH0323438 through HFACMH0032459. The Shipment was loaded into a container number UXXU425258-6 ("Container") in Israel.

Danmar retained ZIM Container Lines ("ZIM") for ocean transport of the Shipment from Haifa, Israel to New York. Danmar also retained Defendant Cargo Connections Logistics Corporation ("Cargo Connections") to haul the Shipment by road from the freight station to its destination in Columbus, Ohio. Cargo Connections in turn retained Palmer Industries to transport the Container to Columbus.

---

[1] The record does not contain a copy of the agreement between Mast and Flying Cargo, but a representative from Mast, James Prior, avers in his affidavit that Mast had a "long term agreement [with Flying Cargo] for freight forwarding services from Israel to the [sic] Columbus, Ohio." (Prior Aff., ¶ 5.)

[2] Flying Cargo indicates that it acted as the local agent in Haifa Israel for the parent company of Danmar, Danzas AEI International, Inc.. Flying Cargo issued the Bills of Lading as agent of Danmar. The face side of the Bills of Lading themselves prominently carry the name "Danmar Lines" on the upper right hand corner, and Flying Cargo is listed on each as the "forwarding agent" and "agents for the Carrier."

ZIM transported the Container from Israel to the United States without incident and it arrived in New York on June 6, 2003. About a week later, on June 13, 2003, Cargo Connections hauled the Container from the terminal in New York to a freight station in New Jersey for overnight storage prior to its transportation to Ohio. Palmer Industries was in charge of operating the Newark, New Jersey freight station where the Container was to be stored. On or about June 13, 2003, some time shortly after it first arrived, the Container was stolen from Palmer Industries' facility. The Shipment was never recovered.

**B.     Bills of Lading**

After contracting with Mast, Danmar subsequently issued Bills of Lading to various other transporters. Each of the Bills of Lading issued by Danmar listed Haifa as the port of loading, New York as the port of discharge, and "Columbus, OH 43207" as the "place of delivery by on-carrier." The Bills of Lading also indicate that "Freight payable by Destination." Each of the Bills of Lading lists Plaintiff Mast Industries, Inc. as the Consignee and Plaintiff Victoria's Secret Stores as the party to notify. Each of the Bills of Lading identifies Danmar as the carrier, and was issued by Flying Cargo "as agent" for Danmar. Further, on the front of each Bill of Lading, the following terms appear:

> In accepting this Bill of Lading, the merchant expressly accepts and agrees to all its terms, conditions and exceptions whether printed, stamped or written or otherwise incorporated, notwithstanding the non-signing of this Bill of Lading by the merchant.

On the reverse side, the terms "carrier" and "merchant" are defined as follows:

> "Carrier" means the company stated on the front of this bill of lading as being the Carrier and on whose behalf this bill of lading has been signed. Carrier is an NVOCC [non-vessel operating common carrier.]
>
> "Merchant" includes the shipper, the consignee, the receiver of the goods, the holder

of this Bill of Lading, any person owning or entitled to the possession of the goods or this Bill of Lading, any person having a present or future interest in the goods or any person acting on behalf of any of the above mentioned persons.

Each Bill of Landing contains the following Jurisdiction and Law Clause:

> The contract evidenced by or contained in this Bill of Landing id [*sic*] governed by the law of Switzerland and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts of Basel-Stadt, Switzerland, and no other court.

Paragraph 6 of the reverse side of each Bill of Lading also provides as follows with respect to the issue of subcontracting:

> 6.1 In addition to the liberties given to the Carrier under the other clauses hereof, it is agreed that the Carrier shall be entitled to sub-contract on any terms the whole or any part of the carriage, loading, unloading, storing, warehousing, handling and any and all duties whatsoever undertaken by the Carrier in relation to the goods.
>
> 6.2 The expression sub-contractor in this clause shall include direct and indirect subcontractors, including stevedores and their respective servants and agents.
>
> 6.3 Himalaya Clause: For the purpose and subject to the provisions of this Bill of Lading, the Carrier shall be responsible for the acts and omissions of any person of whose services it makes use for the performance of the contract evidenced by this Bill of Lading. The Merchant undertakes that no claim or allegation shall be made against any person or vessel whatsoever, other than the Carrier. . . . Without prejudice to the foregoing, all defenses and limitations of the Carrier shall be available to all persons of whose services the Carrier makes use for the performance of this contract. Such persons shall include, but shall not be limited to, the Carrier's servants or agents, independent contractors, including stevedores, terminal operators, carpenters, lashers, container repairmen, and all other persons of whose services the Carrier makes use in perform[ing] this contract . . . .

(Affirmation of Charles DePasquale ¶9, Exhibit B.)

## C. Procedural History

Plaintiffs initiated this action in the Court of Common Pleas for Franklin County, Ohio

against Defendants Danmar, Cargo Connections, Palmer Industries, and unknown Doe Corporations. Defendants jointly removed the action to this Court on the bases of both federal question and diversity jurisdiction. Plaintiffs subsequently amended their Complaint to delete reference to Danmar as a party and to add Flying Cargo as a Defendant.

Generally, Plaintiffs allege that Defendants have violated the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.*, and have converted the merchandise in violation of the common law of the State of Ohio. Defendant Palmer Industries moves for dismissal for the reasons that Plaintiffs' claims are barred by the applicable Bills of Lading and because the forum selection clause contained in the Bills of Lading require any action to be brought in Switzerland. Alternatively, Palmer Industries moves to have this case transferred to the United States District Court fo the District of New Jersey. Defendant Cargo Connections moves for summary judgment on the same bases as raised by Palmer Industries in its Motion to Dismiss. Defendant Flying Cargo moves for summary judgment for the same reasons and for the additional basis that the Court lacks personal jurisdiction over it.

### III.

**A.     Flying Cargo's Motion to Dismiss for Lack of Personal Jurisdiction**

Generally, a district court should resolve jurisdictional issues before moving to the merits of any case. *See Combs v. Bakker*, 886 F.2d 673, 675 (4th Cir.1989)(holding district court should have addressed Rule 12(b)(2) motion before Rule 12(b)(6) motion). Accordingly, the Court turns first to Flying Cargo's Motion to Dismiss for lack of personal jurisdiction before addressing the parties' common challenges on the merits of the case relating to the Bills of Lading.

Upon ruling on Flying Cargo's Motion pursuant to Fed. R. Civ. P. 12(b)(2) before trial, the Court has the discretion to adopt any of the following courses of action: (1) determine the motions based on affidavits alone; (2) permit discovery, which would aid in resolution of the motion; or (3) conduct an evidentiary hearing on the merits of the motion. *Serras v. First Tenn. Bank Nat'l Ass'n.*, 875 F.2d 1212, 1214 (6th Cir.1989). In the instant action, no party has moved for discovery or an evidentiary hearing on the issue of whether the Court has personal jurisdiction over Flying Cargo. Accordingly, because no evidentiary hearing will be conducted, the Court construes all relevant pleading allegations and affidavits in the light most favorable to the Plaintiffs without considering the "controverting" assertions of the Defendant. *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000). Ultimately, the burden of proof lies with the Plaintiffs to prove the existence of a ground for jurisdiction by a preponderance of the evidence. *Id.*

A federal court's exercise of diversity jurisdiction must be both authorized by the law of the state in which it sits and in accordance with the Due Process Clause of the Fourteenth Amendment. *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994). In order to subject a Defendant to *in personam* jurisdiction, the Court must find, first, that the Ohio long-arm statute, set forth at Ohio Rev. Code § 2307.382, permits the exercise of jurisdiction and, second, that the Court's jurisdiction comports with the limits of due process.[3] *National Can Corp. v. K Beverage Co.*, 674

---

[3] Ohio's long-arm statute provides:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;
(2) Contracting to supply services or goods in this state;
(3) Causing tortious injury by an act or omission in this state;
(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct,

F.2d 1134 (6th Cir. 1982).

Ohio's long-arm statute does not extend personal jurisdiction over a non-consenting non-resident to the limits of due process.[4] Although this point was once uncertain and many courts took the view that the Ohio long-arm statute was coextensive with the limits on personal jurisdiction imposed by the Fourteenth Amendment, the Ohio Supreme Court has definitively concluded that the "claim that the General Assembly intended the long-arm statute 'to give Ohio courts jurisdiction to the limits of the Due Process Clause' is erroneous, since that interpretation would render the first part of the court's two-part analysis nugatory." *Goldstein v. Christiansen*, 70 Ohio St.3d 232, 238 n. 1, 638 N.E.2d 541 (1994)(*per curiam*). Thus, the Sixth Circuit now holds that Ohio's long-arm jurisdiction is not as expansive as the constitutional limits of due process. *See Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998). The Court accordingly considers whether Ohio law authorizes the exercise of jurisdiction over Flying Cargo and whether the exercise of that jurisdiction is consistent with Fourteenth Amendment due process.

Plaintiffs argue that the Court may properly exercise specific jurisdiction over Flying Cargo in the context of this case based on its contacts with the State of Ohio. Plaintiffs maintain that Flying Cargo is subject to jurisdiction under the state's long-arm statute because it transacted business in the State of Ohio and contracted to supply goods in this State.

---

      or derives substantial revenue from goods used or consumed or services rendered in this state;

Ohio Rev. Code § 2307.382.

    [4] Defendant Flying Cargo argues that the Sixth Circuit interprets the Ohio long-arm statute, particularly the "transacting any business" provision, as extending to the outer limits under the Due Process Clause. Flying Cargo's personal jurisdiction analysis therefore focuses exclusively on the Fourteenth Amendment. The Sixth Circuit, however, has adopted the approach that the analysis requires a two-step application of Ohio's long-arm requirements as well as a due process inquiry.

In Ohio, "transacting business" means "to carry on business" and "to have dealings," and is "broader than the word 'contract.'" *Goldstein*, 70 Ohio St.3d at 236, 638 N.E.2d 541 (quoting *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St.3d 73, 75, 559 N.E.2d 477 (Ohio 1990)). In this case, Plaintiffs offer the affidavit of James Prior, Senior Director of Transportation and Customer Service for Limited Logistics Services, Inc., a subsidiary of Plaintiff Limited Brands, Inc. While working for Logistics Services, Prior was assigned the responsibility of overseeing the relationships between Mast and various freight forwarders used by Mast to import goods to Columbus, Ohio. (Prior Aff., at ¶ 3.) In his affidavit, Prior states that "[i]n 2003, I was involved with negotiating with Flying Cargo the continuation of the long term agreement for freight forwarding services from Israel to the [*sic*] Columbus, Ohio." (Prior Aff., ¶ 5.) Thus, Plaintiffs assert that the agreement to ship the Merchandise from Israel to Columbus was part of a "long term agreement" for freight forwarding services between Mast and Flying Cargo. Beyond this segment of Prior's statement, Plaintiffs offer no other information regarding the terms, scope, or duration of the alleged long-term agreement between Mast and Flying Cargo.

Flying Cargo emphasizes that it is foreign corporation, organized under the laws of Israel, with its principal place of business in Israel, and that it has no officers, employees or other business-related activity in the State of Ohio. Flying Cargo insists that the only jurisdictional fact Plaintiffs can present consists of one contact in the State of Ohio, namely the single contract at issue in this case to ship the goods from Israel to Columbus. Flying Cargo objects to the exercise of jurisdiction, arguing that the mere fact that it entered into a single contract with an Ohio company, without more, is insufficient to create specific jurisdiction. *Calphalon*, 228 F.3d at 722 ("mere existence of a contract ... is insufficient to confer personal jurisdiction over [defendant].")

-8-

This Court, however, is constrained by the averment made by Prior that Mast and Flying Cargo had a long-term business relationship in which Mast used Flying Cargo for freight forwarding services. The Court must construe Prior's affidavit in the light most favorable to the Plaintiffs without considering the "controverting" assertions of the Flying Cargo. *See Calphalon* 228 F.3d at 721. "Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a prima facie case for jurisdiction.'" *Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 149 (6th Cir. 1997) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991)). Because Prior has averred that the agreement to ship the Merchandise was a continuation of a long-term business arrangement between Mast and Flying Cargo for freight forwarding services, the Court concludes that Plaintiffs have sufficiently established long-arm jurisdiction under the enumerated act of transacting business in the State of Ohio, Ohio Rev. Code § 2307.382(A)(1), so as to properly generate specific personal jurisdiction under the statute.

Having concluded that Flying Cargo is subject to personal jurisdiction in Ohio under the State's long-arm statute, the Court examines next whether the exercise of personal jurisdiction would offend the constitutional limits of due process under the Fourteenth Amendment to the United States Constitution. As for the constitutional aspect of the jurisdictional analysis, the fundamental inquiry is whether Flying Cargo has had "minimum contacts" with the State of Ohio such that the "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). If a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State, it subjects itself to the State's *in personam* jurisdiction even if it has no physical presence in the State. *Quill Corp. v. North Dakota*, 504 U.S. 298, 307 (1992).

The Sixth Circuit applies a three-part test to ensure compliance with due process in the exercise of specific personal jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

Plaintiffs contend that the acts and consequences of Flying Cargo's actions have a substantial enough connection with Ohio to make the exercise of jurisdiction reasonable. They assert that the determinative fact is the that Merchandise was not delivered to Columbus as agreed. Plaintiffs maintain that the damages occurred in Ohio to entities whose principal places of business are in this State. In sum, Plaintiffs argue that Flying Cargo transacted business in Ohio with Ohio companies for the delivery of goods to Ohio to the extent that Flying Cargo should have reasonably expected to be involved in litigation in the State.

1.  **Purposeful Availment**

In the first step of the analysis, the Court considers whether Flying Cargo purposely availed itself of the privilege of conducting activities in the forum state so as to invoke the benefits and protections of its laws. This requirement ensures that a defendant will not be "haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts. . . ." *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985).

In most cases, the Court employs a common sense inquiry as to "whether the defendant has transacted business within the forum state in the usual, commercial sense of 'doing business.'"

*American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988). The inquiry is designed to consider whether the Defendant has become involved with the forum through actions freely and intentionally done which have effects in the forum state. *In-Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 226, 228 (6th Cir. 1972).

As set forth more fully above, the Court concludes that Plaintiffs have adduced enough evidence to survive Flying Cargo's Motion, at least sufficient to overcome a challenge that its contacts with the forum state were wholly fortuitous or attenuated.

### 2. Cause of Action Arise from the Activities in the State

The Court also concludes that Plaintiffs' claims against Flying Cargo arise from Flying Cargo's contacts with Ohio. Plaintiff's Carriage of Goods by Sea Act and state law claim of conversation arise from the alleged failure to perform the contract for freight forwarding. Flying Cargo's contacts with the State of Ohio are related to the operative facts underlying the controversy here.

### 3. Reasonableness

The Court must next consider whether Flying Cargo's acts or the consequences of them have a substantial enough connection with Ohio to make the exercise of personal jurisdiction reasonable. The Court finds, given the minimal requirement on Plaintiffs to prove jurisdictional facts at the procedural juncture in which this Motion arises, that the exercise of jurisdiction over Flying Cargo is reasonable. The Court considers such factors as "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *American Greetings,* 839 F.2d at 1169-70. If the first two factors have been met, then an inference arises that the third factor is also present. *See*

*CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1268 (6th Cir. 1996).[5] Ohio has a strong interest in protecting its residents' property interests. Although Flying Cargo will endure some burden in litigating in Ohio, this burden does not outweigh Plaintiffs' and Ohio's interests and there is no evidence that Flying Cargo will be unable to defend itself in Ohio. Accordingly, the Court concludes that the exercise of personal jurisdiction over Flying Cargo is reasonable.

**B.      Bills of Lading - Limitations on Liability in Himalaya Clause**

Each Defendant moves for judgment or to dismiss the Complaint for the reason that Plaintiffs are barred from asserting claims against them pursuant to the contractual terms, an in particular, the covenant not to sue contained in Section 6, in the Bills of Lading.

A bill of lading is essentially a contract and "records that a carrier has received goods from the party that wishes to ship them, states the terms of the carriage, and serves as evidence of the contract for carriage." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 20 (2004). In the Bills

---

[5]      The Court also considers the inherently multi-national and multi-modal nature of COGSA cases and the maritime character of the contracts at issue in this case. At least one court has recognized that "[p]erhaps it would be a good idea to have a uniform national rule for personal jurisdiction in admiralty and COGSA cases." *United Rope Distributors, Inc. v. Seatriumph Marine Corp.*, 930 F.2d 532, 534 (7th Cir. 1991). The *United Rope* court found, however, that *Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987), effectively foreclosed that notion because *Omni* holds that personal jurisdiction may be created only by statute or federal rule with the force of statute.

However, in *Kirby*, the Supreme Court explained that,

> Article III's grant of admiralty jurisdiction "must have referred to a system of law coextensive with, and operating uniformly in, the whole country. It certainly could not have been the intention to place the rules and limits of maritime law under the disposal and regulation of the several States, as that would have defeated the uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states."

*Kirby*, 543 U.S. at 28 (quoting *American Dredging Co. v. Miller*, 510 U.S. 443, 451 (1994) (internal quotations omitted)).

of Lading in this case, Danmar, the carrier, was authorized to subcontract, in whole or in part, performance of the transportation of the Shipment from Israel to its destination in Columbus, Ohio. (Section 6.1) Defendants rely on Section 6.3 of each Bill of Lading in which Plaintiffs agreed not to sue agents and subcontractors of Danmar. Specifically, Section 6.3 provides that "[t]he Merchant undertakes that no claim or allegation shall be made against any person or vessel whatsoever, other than the Carrier. . . ."

A limitation of liability provision, commonly referred to, as is this case, a Himalaya Clause, extends to inland carriers.[6] In *Kirby*, the Supreme Court announced that Himalaya clauses, properly drafted, extend downstream to all sub-carriers. The Court noted that, in complex over-seas cargo cases, the parties recognize and contemplate the use of various modes of transportation. Accoring to the Court, this industry practice means that the parties must have anticipated that the services of a land carrier, not just the original overseas carrier, would be necessary in performing the contract. *Kirby*, 543 U.S. at 25-26.

The key question in *Kirby* was whether a contract, to which the Kirby, the shipper, was not a party, limited the rights of that shipper against an in-land carrier. A unanimous Court held that it did and protected the in-land railroad carrier with the liability limitations contained in the bills of lading negotiated by an upstream intermediary. The more general issue was whether a cargo owner that contracts with a freight forwarder for transportation of goods to a destination in the United States is bound by the contracts that the freight forwarder makes with carriers to provide that transportation. The Supreme Court found that the contracts arranged by the intermediary-freight

---

[6] Clauses that extend liability limitations take their name from an English case involving a steamship named the *Himalaya*. *Kirby*, 543 U.S. at n.2 (citing *Adler v. Dickson*, 1 Q.B. 158 (C.A.)(1955)).

forwarder prevented the cargo owner from suing the land-carrier for more than the freight forwarder negotiated. The Court held that "when it comes to liability limitations for negligence resulting in damage, an intermediary can negotiate reliable and enforceable agreements with the carriers it engages." *Kirby*, 543 U.S. at 33. Thus, an intermediary, freight forwarder binds a cargo owner to the liability limitations it negotiates with downstream carriers. *Id.* at 34.

   1.   **Downstream Carriers - Palmer and Cargo Connections**

Here, *Kirby* compels the conclusion that Palmer and Cargo Connections may benefit from the liability limitations of the Himalaya Clause contained in the Bills of Lading negotiated by Flying Cargo with Danmar. Plaintiff Mast hired Flying Cargo as a freight forwarding company to arrange for delivery and transportation of the Merchandise from Israel to Columbus, Ohio. (Prior Aff., ¶ 5.) Flying Cargo, however, as a freight forwarder made the arrangement for the movement of cargo at the request Mast. Because Flying Cargo does not itself actually transport cargo, it hired Danmar, an ocean shipping company, to transport the containers.

Danmar was authorized to subcontract, in whole or in part, performance of the transportation of the Merchandise. Danmar, as the Carrier, issued the Bill of Lading containing the Himalaya Clause in which the parties agreed that "[t]he Merchant [in this case, Mast,] undertakes that no claim or allegation shall be made against any person or vessel whatsoever, other than the Carrier. . ." (Bills of Lading, Section 6.3.) The defenses and limitations extended in the Bills of Lading apply "to all persons of whose service the Carrier makes use of for the performance of this contract. . .[which] include, the Carrier's servants or agents, independent contractors, including stevedores, terminal operators, carpenters, lashers, container repairmen, and all other persons of whose services the Carrier makes use in perform[ing] this contract. (*Id.*) The Himalaya Clause operated to protect other

downstream parties who were expected to take part in the transportation. *See Kirby*, 543 U.S. at 33-36; *Bordeaux Wine Locators, Inc. v. Matson Navigation Co.*, 1999 WL 401658 (9th Cir. June 8, 1999)(interpreting plain meaning of a covenant not to sue contained in a bill of lading that applied to intended-beneficiary-downstream subcontractors).

Plaintiffs argue that 46 U.S.C. § 1303(8) of COGSA prevents a carrier from shielding its subcontractors against direct claims by the shipper. That Section provides as follows:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability.

26 App. U.S.C. § 1303(8). The covenant not to sue in the Bills of Lading here, however, is neither contrary to the language of COGSA nor inconsistent with the equitable purposes that *Kirby* sought to address. *Kirby* emphasized that the shipper retained the right to proceed against the carrier who, as the party with full knowledge of the bills of lading at issue "should bear responsibility for any gap between the liability limitations in the bills." *Kirby*, 543 U.S. at 35. Section 1303(8) of COGSA similarly prevents a *carrier* from completely exonerating itself from liability. Inasmuch the covenant not to sue contained in the Bills of Lading does not relieve the carrier, in this case, Danmar, from liability, it comports with Section 1303(8) of COGSA.[7]

---

[7] Moreover, nothing in COGSA or the Bills of Lading here would have prevented Danmar from pursuing its subcontractors for indemnity or contribution. The Court notes, however, that Plaintiffs have dismissed Danmar, as they have deleted reference to Danmar as a defendant in their Amended Complaint. That Plaintiffs have chosen not to avail themselves to their rights against the carrier, does not render the Bills of Lading and the covenant not to sue contained therein contrary to COGSA.

The Motion to Dismiss filed by Palmer Industries, Inc. and the Motion for Summary Judgment filed by Cargo Connections Logistics Corporation are therefore **GRANTED**.[8]

2. **Freight Forwarder - Flying Cargo**

The question arising between the liability of Flying Cargo and Plaintiffs, however, is a different one. *Kirby* serves to protect downstream maritime and in-land carriers trusted with a shipper's goods by extending to them the protections of the liability limitations that their "upstream" counterparts previously negotiated. It is not at all clear to the Court that Flying Cargo was a downstream carrier or an intended beneficiary of the liability limitations contained in Danmar's Bills of Lading.

The parties have not submitted the service agreement between Mast and Flying Cargo, if in fact, one exists. Although it is unclear from the record in this case, in *Limited Brands v. UTI United States*, Case No. 03-CV-1268, 2005 WL 1629777 (S.D. Ohio July 8, 2005)(unreported), this Court noted that Mast operated under a similar arrangement with Flying Cargo as it did with other freight forwarders in different geographic locations. In that case, as here, Limited and Mast argued that the freight forwarder, UTI United States, orally agreed to be responsible for any loss of goods, thereby assuming the liability of the carrier. This Court concluded that, as the freight forwarder, UTI United States was not liable for lost goods because UTI acted merely as a freight forwarder and did not extend its role beyond arranging for transportation into the functions of a common carrier. *Id.* at *3.

Plaintiffs argue that Flying Cargo, acting as Plaintiffs' agent, entered into the written contracts (*i.e.*, the Bills of Lading) in which Flying Cargo exceed the scope of its authority pursuant

---

[8] Because these Defendants' Motions are granted on the basis of the terms of the Bills of Lading and *Kirby*, the Court does not reach the issue of the validity of the Forum Selection Clause or Palmer's request for a transfer of venue under 28 U.S.C. § 1404(a).

to an unwritten understanding between Plaintiffs and Flying Cargo. The relationship between Plaintiffs and Flying Cargo remains unclear from the record now before the Court, and Flying Cargo's liability for allegedly acting outside the scope of an unwritten agency agreement is a matter that cannot be resolved on summary judgment. Nonetheless, the relationship between Plaintiffs and Flying Cargo is a separate matter from the liability of downstream carriers. Having authorized Flying Cargo in some manner to enter into transportation agreements, Plaintiffs are bound under *Kirby* to the agreements this intermediary made with third-party subcontractors. *Kirby*, however, does not vitiate all liability between carriers, or freight forwarders acting as common carriers, and cargo owners.[9]

The Court cannot find from the record before it that Flying Cargo can avail itself, as "downstream carrier," of the liability limitations contained in the Bills of Lading that itself issued as "agent for" Danmar. Flying Cargo may or may not be a freight forwarder whose liability may be limited to damages caused by its own negligence. "A freight forwarder is not liable to the shipper so long as its role is limited to arranging for transportation." *Limited Brands v. UTI United States*, 2005 WL 1629777 at *3 (citing *United States v. American Union Transport*, 327 U.S. 437, 442-43 (1946)). These matters, however, have neither been raised nor briefed by the parties. Accordingly, as it stands and viewing the facts in a light most favorable to Plaintiffs, the Court must **DENY** Flying Cargo's Motion for Summary Judgment.

---

[9] In the *UTI United States* case, Limited Brands and Mast argued that UTI United States was a common carrier, not merely an uninvolved freight forwarder, and that *Kirby* secured its right to recover against it. (See *Limited Brands, Inc. v. UTI United States, Inc.*, S.D. Ohio, Case No. 03-CV-1268, Response in Opposition to Mot. for Summ. Jdgmt., (Doc. #22)).

## IV.

For the foregoing reasons, the Motion to Dismiss of Defendant, Palmer Industries, Inc. (Doc.#35), is **GRANTED.** The Motion for Summary Judgment filed by Defendant, F.C. (Flying Cargo) international Transportation Ltd. (Doc. #36) is **DENIED.** The Motion for Summary Judgment filed by Defendant, Cargo Connections Logistics Corporation (Doc. #56) is **GRANTED.**

**IT IS SO ORDERED.**

3-27-2006
**DATED**

**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**