```
               IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF OHIO
                         EASTERN DIVISION
```

Limited Brands, Inc., et al., :

       Plaintiffs,       :

       v.                       :       Case No. 2:04-cv-0632

Danzas AEI Intercontinental   :       JUDGE SARGUS
Inc., et al.
                                   :

       Defendants.

<u>REPORT AND RECOMMENDATION</u>

     This case involves plaintiffs' claim for reimbursement for the value of a quantity of goods that were manufactured in Israel and apparently stolen sometime after they arrived in the United States. As reflected in this Court's order dated December 18, 2006, Defendant F.C. (Flying Cargo) International Transportation, Ltd. was the freight forwarder involved in the shipping of the goods. After the Court denied Flying Cargo's motion to dismiss, Flying Cargo filed a motion for reconsideration, arguing that the plaintiffs had not adequately demonstrated that the Court could properly exercise personal jurisdiction over it. In the December 18, 2006 order, the Court noted that one of the key documents relied upon in denying Flying Cargo's motion, an affidavit of James Prior, was somewhat conclusory concerning the nature and extent of the business relationship between the plaintiff Mast Enterprises and Flying Cargo. The Court also noted that it was unclear where, in the context of the alleged long-term relationship between Mast and Flying Cargo, the shipment at issue in this case fell. Further, no contract between Mast and Flying Cargo was tendered to the Court. Given these ambiguities in the record, the Court concluded that the best way to resolve the

personal jurisdiction issue was to conduct an evidentiary hearing.  As the order noted, the purpose of the hearing was to "resolve the disputed fact of whether Mast and Flying Cargo had an on-going business relationship or if they entered into this single contract."

The hearing was scheduled for February 20, 2007.  That day, United States District Judge Edmund A. Sargus, Jr. entered an oral order referring the matter to the undersigned for the conduct of the hearing and the issuance of a Report and Recommendation.  This procedure was also discussed with counsel for the parties prior to the hearing and counsel expressed no objection.  Consequently, the hearing was held on that day.  Two witnesses testified, four exhibits were admitted, and two depositions were submitted for the Court's consideration.  This Report and Recommendation constitutes the Court's recommended findings of fact, conclusions of law, and disposition with respect to the outstanding personal jurisdiction issue.

## I. RECOMMENDED FINDINGS OF FACT

The Court will summarize the testimony given by the two live witnesses and two deposition witnesses and the information contained in the four exhibits.  At the conclusion of that summary, the Court will recommend specific factual findings.  It should be noted that, almost without exception, there is no dispute between the parties as to the operative facts.  In particular, there is little dispute about the nature or extent of the business relationship between Mast and Flying Cargo.

Chronologically, the nature and duration of the parties' business relationship can be described as follows.  Mast, which at all pertinent times was a wholly-owned subsidiary of plaintiff Limited Brands, Inc., and a sister corporation to plaintiff Victoria's Secret, Inc., the ultimate purchaser of the goods involved in this case, was given at least two distinct corporate

functions by Limited Brands.  One was to act as owner of goods manufactured by various clothing manufacturers.  In this case, the manufacturer at issue was a company located in Tel Aviv, Israel, which made garments for Victoria's Secret.  The other distinct function was to arrange for the transportation of those goods from their country of origin to the customer's ultimate location, which for Victoria's Secret was usually a distribution center located in Columbus, Ohio.  Mast's principal place of business was in Andover, Massachusetts until sometime in 2003 when its operations were relocated to Columbus.

As part of its corporate responsibilities, Mast was required to enter into contracts with various freight forwarding entities. Flying Cargo, an Israeli corporation, was one of these freight forwarders.  It is unclear exactly when Mast and Flying Cargo began to do business together.  Neither Sharon Armstead nor James Prior, the two witnesses who testified at the hearing, worked for Mast at the time the business relationship began.  Ms. Armstead joined Mast sometime in 2000, and although Mr. Prior worked for Limited Logistics, Inc., prior to that time, he had no involvement with Mast's business until early 2003.  Evelyn Cohen, a highly-placed employee of Flying Cargo, began working for Flying Cargo in 1987 and was with the company when it began doing business with Mast.  Her best guess was that the relationship began in 1998, and she thought it lasted for approximately eight years.  However, because the parties stopped doing business in either 2004 or 2005, she may have been a year or two off concerning the commencement or duration of the business relationship.  Nevertheless, it appears that the relationship began as early as 1998, lasted through sometime in 2004, and was not interrupted during that six-year time span.

The nature of the relationship was not seriously disputed, even though the parties were able to provide the Court with only

a single written contract.  Further, only one addendum to the contract introduced into evidence was signed by Flying Cargo, and Mast did not sign the contract at all.  That contract covered international shipments of cargo from roughly June 1, 2003 through May 31, 2004.  Because the witnesses appeared to agree that the terms of the parties' arrangement were contractual in nature and did not differ significantly from year to year, other than as to the rates charged for shipments of cargo, the Court will use the proffered contract (Plaintiff's exhibit 1) as a template for laying out the nature of the relationship.

    Under the 2003-2004 contract, Flying Cargo agreed to act as a freight forwarding agent for Mast.  Most of the contractual terms described the type of information and services which Flying Cargo agreed to provide, and defined certain terms such as "Committed Transit Time" or "Guaranteed Transit Time" which were used to measure whether Flying Cargo had complied with the time requirements of the contract.  A rate schedule indicating the amount that Flying Cargo would charge Mast for either air or ocean shipments from Israel to various places in the United States was attached to the contract.  That rate schedule listed three air freight destinations: Columbus, New York, and Chicago.  The only ocean freight destination was Columbus.  The air freight charges quoted for air shipment of goods to New York or Chicago included a separate rate for ground transportation to Columbus.

    Mast had set a procedure for its freight forwarding procurement.  First, Mast would invite a number of freight forwarders to submit bids on particular routes.  After the bids were submitted, Mast would select the bid that it deemed most responsive and enter into negotiations with that forwarder for a contract.  For the Israel to Columbus routes, the price negotiations usually began in March or April of the year with a view toward completing those negotiations and having rates agreed

4

upon by June 1.  In the August 1, 2003 contract, all the air rates were effective from June 1, 2003 to May 28, 2004.  The ocean freight rate was quoted on May 15, 2003, did not specify a beginning date, and was effective through May 31, 2004.  It appears that the parties followed this bid and contracting process at least from 1998 through 2004.  However, in 2004 or 2005, Mast accepted a bid for the Israel to Columbus routes from a different freight forwarder, and Flying Cargo has not acted as freight forwarder for either Mast or any other Limited subsidiary since that date.  Earlier versions of the contract were not produced because, according to the two live witnesses, either contracts were not signed or they were discarded as part of Mast's corporate relocation in 2003.  Evelyn Cohen testified in her deposition that contracts were signed for each of the years in question.  The record is unclear as to whether Flying Cargo has copies of these contracts.

    Both Sharon Armstead and Evelyn Cohen testified concerning the volume of business done pursuant to the contracts.  Ms. Armstead estimated the volume in dollar terms, testifying that in her early years at Mast, 2000 and 2001, Flying Cargo was paid between $1 million and $1.5 million per year for its freight forwarding services.  In later years, because the quantity of shipments increased, she believed that the compensation was greater.  Ms. Cohen testified that over the course of the parties' relationship, Flying Cargo arranged for the transportation of thousands of shipments of goods from Israel to Columbus, and that between 300 and 700 containers per year were shipped.  She did qualify her testimony concerning the destination of these goods by indicating that although the final destination listed on the bill of lading was always Columbus, Ohio, she did not know where the goods actually ended up.  She denied that Flying Cargo was responsible for arranging the

transportation of the goods to Columbus after they arrived in New York.  All witnesses agreed that goods shipped to Columbus by air actually arrived in New York, usually at JFK airport, because there are no direct flights from Israel to Port Columbus airport.

During the years in question, it appears that only a single in-land carrier, Cargo Connections, was used to transport goods to Columbus, Ohio after they arrived in New York, either at the port or at JFK airport.  There was a slight conflict in the testimony concerning the relationship between Cargo Connections, Mast, and Flying Cargo.  According to plaintiffs' witnesses, either Mast or other Limited companies negotiated transportation rates with Cargo Connections.  Forwarders such as Flying Cargo were then advised that they could either use Cargo Connections as their in-land carrier, or, if they could find another carrier who could perform the work at the same rate and meet the other requirements of the plaintiffs, that other carrier would also be approved.  Ms. Cohen testified, however, that Flying Cargo was not given that option and that it was required to use Cargo Connections for all of the in-land transportation services.

The rates quoted in the contract for transportation of goods by either air or ocean carrier included rates for land transportation.  When Flying Cargo, either directly or through an agent, billed Mast for transportation services, those bills also included that portion of the transportation performed by Cargo Connections.  Ms. Cohen testified that the arrangement was strictly one of convenience and that Flying Cargo never had a contract with Cargo Connections.  On the other hand, plaintiffs' witnesses testified that neither Mast nor any other Limited entity had a direct contract with Cargo Connections and that they were never billed directly by Cargo Carriers for transportation services performed under the Flying Cargo contract.  In any event, the one contract produced by the parties shows that Flying

Cargo quoted rates for transporting goods from Israel to Columbus, Ohio, including land transportation.  Further, all of the bills of lading for shipments of these goods stated that Columbus, Ohio was the final destination of the goods.

There was some question raised as to whether a separate bill of lading was issued once goods were delivered to the United States.  The witnesses appeared to agree that, on some occasions, containers of goods were shipped directly from their point of arrival in the United States to Columbus without being unloaded and repackaged.  Other shipments, however, perhaps a majority of them, were unloaded from the overseas shipment containers and repackaged into different freight loads, perhaps with other goods originating from other sources, and then transported to Columbus.  Cargo Connections appears to have been the entity that accomplished this repackaging.  It was suggested that another bill of lading would then issue once the truckload of goods was assembled, but Mr. Prior, who was asked about this procedure, confirmed only that some type of document, such as a trucking manifest, would have to reflect the exact composition of each truckload.  No separate bill of lading for any of these shipments was produced at the hearing.

During the six-year course of performance there was constant communication between Mast and Flying Cargo.  The parties established what was described as an "EDI" (electronic data interface) which permitted electronic information concerning the status of each shipment to be transmitted to Mast.  Flying Cargo reported to Mast when a shipment was picked up, when it was loaded on to an airplane or an ocean-going vessel, its status during transport, when it arrived in New York, and when it was picked up by Cargo Connections. Quarterly meetings were also held concerning any performance issues which arose under the contract.  Ms. Armstead testified that these meetings were attended by

representatives of Flying Cargo.  However, Joseph Leeran, the person she identified as the Flying Cargo representative who attended many of these meetings, testified that he did so as an employee of Danzas (Flying Cargo's agent) rather than of Flying Cargo.  Nevertheless, he sent e-mails concerning the lost shipment involved in this case from a Flying Cargo e-mail address.  Ms. Armstead said she assumed he was a Flying Cargo employee because she had not been told otherwise and because he represented Flying Cargo at the quarterly meetings.

Finally, given the volume of business done between the parties, it is likely that there was at least one shipment in transit on an almost daily basis for the entire period of the parties' contractual arrangement.  As a result, there were communications about the status of these shipments on a daily basis as well.  Again, those communications would, at least until the middle of 2003, have been directed primarily, if not exclusively, to Mast's headquarters in Andover, Massachusetts.  However, after Mast moved its operations to Columbus, the communications would have been made directly to Columbus.  Because Mast did not relocate to Columbus until after the date of the shipment which is at issue in this case, however, none of Flying Cargo's communications concerning that shipment were directed to Columbus.  Nevertheless, it is likely that Flying Cargo did at least $1 million worth of freight forwarding business with Mast after it relocated its headquarters to Ohio.

Based on the foregoing, it is recommended that the Court make the following factual findings:

1. A contractual relationship existed between plaintiff Mast Industries and defendant Flying Cargo for at least six years, beginning in approximately 1998 and ending in either 2004 or 2005.
2. The contract, or series of contracts, between those two

8

      parties called for Flying Cargo to transport goods from a manufacturer located in Israel to a distribution center located in Columbus, Ohio.

3. Over the course of performance, Flying Cargo billed Mast annually for at least $1 million in freight charges, which included not only the cost of shipping goods from Israel to New York City, but the cost of transporting those goods from New York City to Columbus.

4. Over the course of performance, Flying Cargo charged for the shipment of at least 300 containers of goods annually.

5. During the six years of the parties' contractual relationship, Flying Cargo provided information to Mast on a daily basis about the status of these shipments. That information included advising Mast when a shipment had been picked up by Cargo Connections, an in-land carrier, for transportation to Columbus.

6. The shipment that is the subject of this case was a routine shipment of goods that Flying Cargo was obligated, pursuant to the contract, to deliver to Columbus, Ohio.

7. Mast's principal place of business at the time this shipment was stolen was in Andover, Massachusetts. Mast moved its principal place of business to Columbus, Ohio in June, 2003, and Flying Cargo continued to deal with Mast under the same contractual arrangement until either 2004 or 2005.

## II.  APPLICABLE STANDARDS

**A.  Standard of Review**

In this case, because Flying Caro challenges the exercise of personal jurisdiction over it, the Court, in its discretion, ordered a pretrial evidentiary hearing on the disputed facts. "[I]f the district court concludes that the written submissions have raised issues of credibility or disputed issues of fact which require resolution, it may conduct a preliminary evidentiary hearing."  Welsh v. Gibbs, 631 F.2d 436, 439 (6th Cir. 1980).  At the evidentiary hearing, the plaintiff must now establish that jurisdiction exists by a preponderance of the evidence. Id.; see also Marine Midland Bank v. Miller, 664 F.2d 889, 904 (6th Cir. 1981).  Moreover, a pretrial ruling denying a motion to dismiss "'does not purport to settle any disputed factual issues germane to the underlying substantive claim. What is settled is the court's power to exercise personal jurisdiction over a defendant, nothing more.'"  Serras v. First Tennessee Bank Nat. Ass'n, 875 F.2d 1212, 1214-15 (6th Cir. 1989)(quoting Val Leasing, Inc. v. Hutson, 674 F. Supp. 53, 55 (D. Mass. 1987)).

**B.  *In Personam* Jurisdiction**

A federal court's exercise of jurisdiction must be both authorized by the law of the state in which it sits and in accordance with the Due Process Clause of the Fourteenth Amendment.  Reynolds v. Int'l Amateur Athletic Fed'n, 23 F.3d 1110, 1115 (6th Cir. 1994).  In order to subject a defendant to *in personam* jurisdiction, the Court must find, first, that the Ohio long-arm statute, set forth at Ohio Rev. Code §2307.382, permits the exercise of jurisdiction and, second, that the

Court's jurisdiction comports with the limits of due process.[1] National Can Corp. v. K Beverage Co., 674 F.2d 1134 (6th Cir. 1982).

Ohio's long-arm jurisdiction is not as expansive as the constitutional limits of due process.  See Cole v. Mileti, 133 F.3d 433, 436 (6th Cir. 1998).  The Court accordingly considers whether Ohio law authorizes the exercise of jurisdiction over Flying Cargo and whether the exercise of that jurisdiction is consistent with Fourteenth Amendment due process.

### III. ANALYSIS

Throughout this litigation, plaintiffs have maintained that the Court may properly exercise specific jurisdiction over Flying Cargo based on its contacts with the State of Ohio.  Plaintiffs assert that Flying Cargo is subject to specific jurisdiction under the state's long-arm statute because it transacted business in the State of Ohio and contracted to supply goods in this state.  Plaintiffs argue that the arrangement for shipment in this case was part of a "long term agreement" for all freight forwarding services between Mast and Flying Cargo for merchandise purchased in Israel.  Flying Cargo, on the other hand, has argued

---

[1] Ohio's long-arm statute provides in relevant part:

(A)  A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;
(2) Contracting to supply services or goods in this state;
(3) Causing tortious injury by an act or omission in this state;
(4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; . . . .

Ohio Rev. Code §2307.382.

in support of its motion to dismiss and motion to reconsider that the only jurisdictional fact plaintiffs can present consists of one contact with the State of Ohio, namely the contract at issue in this case which required Flying Cargo to ship goods from Israel to Columbus. Flying Cargo objects to the exercise of jurisdiction, arguing that the mere fact that it entered into a single contract with an Ohio company is insufficient to create specific jurisdiction.

The Court set this matter for a hearing because the chief factual dispute between the parties appeared to be whether Mast and Flying Cargo had a single contract for the transportation of the merchandise which ultimately was stolen, as Flying Cargo contended, or whether this shipment was part of a continuous, long-term business relationship between the parties, as plaintiffs asserted. Based on the evidence presented at the hearing and summarized above, it appears beyond dispute that the business relationship between Mast and Flying Cargo began as early as 1998 and lasted, without interruption, through at least some time in 2004. The shipment of stolen merchandise which is the subject of this case was part of a routine shipment of goods that Flying Cargo was contractually obligated to deliver to the State of Ohio.

Under Ohio law, "transacting business" means "to carry on business" and "to have dealings," and is "broader than the word 'contract.' " Goldstein v. Christiansen, 70 Ohio St. 3d 232, 236, 638 N.E. 2d 541 (Ohio 1994)(quoting Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc., 53 Ohio St. 3d 73, 75, 559 N.E. 2d 477 (Ohio 1990)). "With no better guideline than the bare wording of the statute to establish whether a nonresident is transacting business in Ohio, the court must, therefore, rely on a case-by-case determination." U.S. Sprint Comm'n Co. v. Mr. K's Food, Inc., 68 Ohio St. 3d 181, 185 (1994).

The Court concludes that plaintiffs have established long-arm jurisdiction by a preponderance of the evidence by demonstrating that Flying Cargo was transacting business in the State of Ohio as defined in Ohio Rev. Code §2307.382(A)(1).  The evidence clearly demonstrates that the agreement to ship the merchandise at issue in this case was a continuation of a six-year business arrangement for freight forwarding services between Mast and Flying Cargo.  Under the terms of the parties' contractual agreements, Flying Cargo agreed to transport goods from a manufacturer located in Israel to a distribution center in Columbus, Ohio.  Although Flying Cargo insists that Cargo Connections was responsible for inland carriage of goods, the rates Flying Cargo charged Mast included ground transportation from port to final destination in Columbus.  Over the course of performance, Flying Cargo or its agent invoiced Mast over $1 million annually for transporting goods from Israel, including inland transportation from New York to Columbus, Ohio.  All of the bills of lading for shipments indicated that the final destination for the goods was Columbus, Ohio.  This evidence supports the conclusion that Flying Cargo transacted business in Ohio.

Flying Cargo nonetheless contends that Mast's principal place of business at the time this shipment was stolen was Andover, Massachusetts and that its communications regarding the lost shipment, and the majority of all others, were directed to Mast in Massachusetts.  Thus, according to Flying Cargo, it had no contacts with the State of Ohio.  That Mast was located in Massachusetts until June, 2003, however, is of no consequence in light of the fact that Flying Cargo obligated itself to deliver merchandise to a Limited Brands entity located in the State of Ohio.  <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462 (1985).  In any event, Flying Cargo continued to engage in freight forwarding

services under the same contractual arrangement and invoiced over $1 million for services rendered after Mast relocated its headquarters to Columbus.  The Court finds no merit to Flying Cargo's contention that it had no contacts and transacted no business within the State of Ohio because its communications with Mast were directed primarily to Massachusetts until June, 2003.

Having concluded that Flying Cargo is subject to personal jurisdiction in Ohio under the state's long-arm statute, the Court turns to the issue of whether the exercise of personal jurisdiction would offend the constitutional limits of due process under the Fourteenth Amendment to the United States Constitution.  In assessing the constitutional component of the jurisdictional analysis, the essential inquiry is whether Flying Cargo has had "minimum contacts" with the State of Ohio such that the "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  If a foreign corporation purposefully avails itself of the benefits of an economic market in the forum state, it subjects itself to the state's *in personam* jurisdiction even if it has no physical presence in the state.  Quill Corp. v. North Dakota, 504 U.S. 298, 307 (1992).

The Court determined in its prior order on this subject that under the three-part test of Southern Machine Co. v. Mohasco Industries, Inc., 401 F.2d 374, 381 (6th Cir. 1968), the exercise of jurisdiction over Flying Cargo comports with due process.  In particular, having found that Flying Cargo transacted business in Ohio, the Court ascertained that Flying Cargo purposefully availed itself of the privilege of acting or causing a consequence in Ohio.  The Court also previously determined that plaintiffs' cause of action for the lost merchandise arose from Flying Cargo's connections to Ohio, and that its acts had a

14

substantial enough connection with the state to make the exercise of jurisdiction over the defendant reasonable. (See Opinion and Order, March 27, 2006, at pp. 9-12.)

The evidence adduced at the hearing serves only to reinforce the Court's conclusions that the exercise of personal jurisdiction comports with due process. Nothing in the witnesses' depositions or testimony at the hearing undermines the Court's determinations that Flying Cargo became contractually involved with the State of Ohio "through actions freely and intentionally done which have effects in the forum state." In-Flight Devices Corp. v. Van Dusen Air, Inc., 466 F.2d 220, 226, 228 (6th Cir. 1972). In view of its six-year contractual commitment for freight forwarding services to Ohio, Flying Cargo cannot seriously contend that it has been "haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts. . . ." Burger King v. Rudzewicz, 471 U.S. 462, 475 (1985). The evidence supports the Court's previous findings that plaintiffs' causes of action arise from the alleged failure to perform the contract for freight forwarding services by delivering the merchandise to the distribution center in Columbus.

## IV. RECOMMENDED CONCLUSION OF LAW

For the foregoing reasons, it is recommended that the Court reach the legal conclusion, based upon the facts proved by a preponderance of the evidence at the evidentiary hearing, that the exercise of personal jurisdiction over Flying Cargo is reasonable. Consequently, the motion to reconsider (#62) should be denied.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within ten (10) days of the date of this Report, file and serve on all parties written objections to those specific

proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a _de novo_ determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. Section 636(b)(1).

　　　The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation _de novo_, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See _Thomas v. Arn_, 474 U.S. 140 (1985); _United States v. Walters_, 638 F.2d 947 (6th Cir.1981).

　　　　　　　　　　　　　　　　　/s/ Terence P. Kemp
　　　　　　　　　　　　　　　　　United States Magistrate Judge