IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

LIMITED BRANDS, INC.,
et al,

      Plaintiffs,

vs.

      Case No. C2-04-632
      Judge Edmund A. Sargus, Jr.
      Magistrate Judge Terence P. Kemp

F.C. (FLYING CARGO) INT'L
TRANSPORTATION LTD.,
et al.,

      Defendants.

## OPINION AND ORDER

This matter is before the Court for consideration of the Motions for Summary Judgment filed by Plaintiffs Limited Brands, Inc. ("Limited"), Mast Industries ("Mast") and Victoria's Secret Stores, Inc. ("Victoria's Secret") (collectively "Plaintiffs") against F.C. International Transportation, Ltd. ("Flying Cargo"); Palmer Industries, Inc. ("Palmer") as to the Cross-claims of Flying Cargo; and Cargo Connections Logistics Corporation ("Cargo Connections") as to the Cross-claims of Flying Cargo, as well as Flying Cargo's Cross-Motion for Summary Judgment against Plaintiffs. After thorough review of the parties' Motions, the Court concludes that each is denied.

### I.

The Court has set forth the facts of this case on several previous occasions, and will not repeat the details here except as necessary to place the issues raised in the parties' Motions into context. Concisely, Mast Enterprises is a subsidiary of Limited Brands and contracts for the

manufacture of goods that it sells to Limited Brands' entities. Mast arranges for the delivery of the manufactured goods to Columbus, Ohio.

A contractual relationship between Mast and Flying Cargo existed for at least six years, starting in approximately 1998 and ending in 2004 or shortly thereafter. During this business relationship, Flying Cargo arranged countless shipments for ocean transport of products from Israel for Mast. Under the agreements, Flying Cargo, or its agent, would invoice Mast for the entire transportation costs from Israel to Columbus at an agreed-upon rate.

Danmar and Flying Cargo are both part of Danza's global transportation network. Flying Cargo was an exclusive agent for Danzas out of Israel. Flying Cargo and Danzas worked together to provide services under the Service Agreements with Mast. Danzas employed Joseph Leeran, who used a Flying Cargo e-mail address and was designated as Flying Cargo's contact for cargo issues. Leeran also provided regular updates to Mast on the status of its cargo shipments.

In 2003, Mast purchased certain goods from Delta Galil Industries Ltd., located in Tel Aviv, Israel, which Mast subsequently sold to Victoria's Secret, also a Limited Brands' subsidiary. On or about May 21, 2003, Plaintiffs contracted with Flying Cargo, for the shipment of 596 cartons of garments ("Shipment" or "Merchandise") from Israel to Columbus, Ohio.[1] Flying Cargo, as part of

---

[1] The record does not contain an authenticated copy of an executed agreement between Mast and Flying Cargo covering the period of the loss at issue in this case. It appears, however, that Mast sent a contract to Flying Cargo, entitled "Airfreight Forwarder Service Agreement," which contains terms relating to performance, payment for freight and delay penalties. It also contains an attachment labeled "Updated Ocean Freight & Inland to CMH." (Flying Cargo's Mem. Opp, Exh. B, at p. 15.) According to this document, the freight rates were issued on May 15, 2003 and were valid through May 31, 2004. The complete contract for forwarding services, however, was not executed by Flying Cargo's representative, Evelyn Cohen, until August 1, 2003. (*Id.* at p. 12.) The loss at issue in this case occurred on or around June 13, 2003. It appears, but the Court cannot conclude from the record before it for purposes of summary judgment, that the Shipment of merchandise was transported from Israel to the United States as a matter of routine, as part of an ongoing agreement between Mast and Flying Cargo.

an ongoing contract with its affiliate, hired Danmar Lines ("Danmar"), for the carriage of the Merchandise.

Danmar accepted the Merchandise for carriage and issued a Master Waybill. Each of the Bills of Lading identifies Danmar Lines as the carrier, and indicates that they are issued by Flying Cargo "as agent for" Danmar. The Bills of Lading are consecutively numbered HFACMH0323438 through HFACMH0032459. The Shipment was loaded into a container number UXXU425258-6 ("Container") in Israel. The Bills of Lading also contain a remark that each load was "LCL," or less than a container load. (Yosi Dep., at 31.)

Flying Cargo hired Zim Israel Navigation Co., Ltd. "(Zim") to provide the ocean carriage from the port in Haifa to the port in New York. Defendant Cargo Connections was hired to haul the Shipment by road from the freight station to its destination in Columbus, Ohio. Cargo Connections, in turn, retained Palmer Industries either to transport the Container to Columbus, or to repair a damaged container.[2]

Zim transported the Container from Israel to the United States without incident and it arrived in New York on June 6, 2003. About a week later, on June 13, 2003, Cargo Connections hauled the Container from the terminal in New York to a freight station in New Jersey for overnight storage prior to its transportation to Ohio. Palmer was in charge of operating the Newark, New Jersey freight station where the Container was to be stored. On or about June 13, 2003, some time shortly after

---

[2] The record is not complete in this case, but is replete with unauthenticated and hearsay documents which are not proper under Federal Rule of Civil Procedure 56. As it stands, Flying Cargo attached two pages of Sharon Armstead's deposition transcript to its Memorandum in Opposition to Palmer's Motion for Summary Judgment, which was taken in connection with Flying Cargo's Motion to Dismiss for lack of personal jurisdiction. In it, Ms. Armstead indicates that she believes Palmer was hired to repair a damaged chassis on a container. Counsel for Palmer was not notified of this deposition and had no opportunity to cross examine Ms. Arstead.

it first arrived, the Container was stolen from Palmer's facility. The Shipment was never recovered.

## II.

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence

-4-

of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to a judgment as a matter of law. The fact that one party fails to satisfy that burden on his or its own Rule 56 motion does not automatically indicate that the opposing party has satisfied the burden and should be granted summary judgment on the other motion. In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light more favorable to the non-moving party. *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)(citations omitted). The standard of review for cross motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

### III.

**A.  Plaintiffs' and Defendant Flying Cargo's Cross Motions for Summary Judgment**

Both Plaintiffs' and Defendant Flying Cargo's Cross Motions for Summary Judgment are **DENIED**. The Court finds that neither Plaintiffs nor Flying Cargo has demonstrated, through

-5-

competent evidence under Federal Rule of Civil Procedure 56, that it is entitled to judgment as a matter of law on the material issue of whether Flying Cargo acted as a freight forwarder, or if its role extended beyond simply arranging for the transportation of the Merchandise to render it liable as a carrier. The record remains unclear as to whether Flying Cargo agreed to be responsible, through oral or written contract, to assume a greater responsibility than that of a mere freight forwarder with respect to the lost or stolen Merchandise.

Flying Cargo contends that the case of *Limited Brands, Inc. v. UTi United States*, Case No. 03-CV-1268, 2005 WL 1629777 (S.D. Ohio July 8, 2005) is controlling, and compels the conclusion that Flying Cargo was freight forwarder with respect to the stolen Merchandise at issue in this case. In the *Uti* case, Mast retained Uti-United States, Inc. to arrange for the transportation of the merchandise from Italy to the United States. Uti-United States thereafter hired Uti-Italy, Inc., a separate and distinct corporate entity, to arrange for the transportation of these goods. Uti-Italy loaded the merchandise onto an ocean vessel in Italy for carriage to New York. Uti-Italy appeared as the shipper in the bills of lading, which were issued by the ocean vessel-carrier. Once the shipment reached the United States, Cargo Connections, who was to perform the inland carriage of the goods, inspected the cartons, and noted that several were missing. *Id.* at *1. The Court first found that Mast and Uti-United States had no signed service agreement between them, and therefore referred strictly to the bills of lading and Uti-United States' invoices as the controlling contracts with respect to the parties' obligations regarding the missing cargo. The Court found, from these documents, Uti-United States was a freight forwarder.

As the Court reasoned, "[a] freight forwarder is an entity that makes arrangements for the movement of cargo at the request of its client. A carrier, on the other hand, is an entity that is directly

involved in transporting the cargo." *Uti*, 2005 WL 1629777 at * 2 (citing *Prima U.S., Inc. v. Panalpina*, 223 F.3d 126, 129 (2d Cir. 2000)). "Unlike a carrier, a freight forwarder does not issue a bill of lading, and is therefore not liable to a shipper for anything that occurs to the goods being shipped." *Id.* at 129. A freight forwarder is not liable to the shipper so long as its role is limited to arranging for transportation. *Id.*; *United States v. American Union Transport*, 327 U.S. 437, 442-43 (1946) (independent forwarders "assume no responsibility for the transportation of goods").

A carrier is the "owner, manager or charterer, agent, or master of a boat." 43 U.S.C. § 1301(a).[3] A shipper retains the right to proceed against a carrier who, as the party with full knowledge of the bills of lading at issue "should bear responsibility for any gap between the liability limitations in the bills." *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14, 35 (2004).

As the Court reasoned, "[a] party that classifies itself a freight forwarder might in fact be performing the functions of a carrier, in which case function would govern over form." *Uti*, 2005 WL 1629777 at *2:

> Factors to be considered in determining whether a party acted only as a forwarder or as a forwarder-carrier include (1) the way the party's obligation is expressed in documents pertaining to the agreement; (2) the history of dealings between the parties; (3) issuance of a bill of lading; and (4) how the party made its profit.

*Zima Corporation v. M.V. Roman Pazinski*, 493 F.Supp. 268, 273 (S.D.N.Y.1980). None of these factors, however, is dispositive. *Id.* The Court also noted that, if a party acts as an "agent of the shipper ... procuring transportation by carrier and handling the details of shipment" for fees "which the shipper paid in addition to the freight charges of the carrier utilized for the actual transportation"

---

[3] The Court notes that the Carriage of Goods by Sea Act ("COGSA") was amended and renumbered by Congress on October 6, 2006, and now begins at section 30701 of Title 46. In their pleadings and papers, however, the parties refer to the Act's previous statutory numbering. The Court, therefore, refers to COGSA by its section numbers before it was revised.

then the party would be liable only as a forwarder. Id. at *2 n.1 (quoting *Chicago, Milwaukee, St. Paul & Pacific R.R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 484 (1949)). If the party "picked up the less-than-carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination . . . [charging] a rate covering the entire transportation and [making] its profit by consolidating the shipment with others to take advantage of the spread between carload and rates," while the shipper "seldom if ever knew which carrier would be utilized in the carriage of his shipment," then the forwarder would be liable as a carrier. *Id.*

Reviewing these factors, the Court in *Uti* found that Uti-United States had limited its role to arranging for the transportation of the goods as a freight forwarder. There, Uti-United States did not issue a bill of lading; was not listed as the shipper on the ocean carrier's bill of lading; and its invoices identified it as an arranging forwarder, not a carrier. Moreover, the Court found no evidence to suggest that Uti-United States and Mast had entered into an effective written service agreement or oral contract that would render it liable for anything more than a freight forwarder.[4] *Id.*

*Uti* is factually distinguishable from this case and, contrary to Flying Cargo's assertions, does not address the primary issue in this matter. As set forth in *Uti*, the determination of whether a party is a freight forwarder or carrier requires a fact-intensive analysis of several factors. Flying Cargo has

---

[4] In *Uti*, Mast argued that it had a signed "Airfreight Forwarder Service Agreement," presumably similar to the one at bar, in which Uti agreed to be responsible for any loss goods, thereby assuming liability as a Carrier. *Uti*, 2005 WL 1629777 *2 & n.4. The Court found that, even if such service agreement were in effect at the time of the loss, it would only apply to air transport. The Uti case makes no mention of whether Uti and Mast had a long-term business arrangement or if the service agreement in the record had with it an attachment for freight costs associated with ocean transport, thereby indicating the parties' intention to be bound by its terms for such transactions, notwithstanding its title as an agreement related to "airfreight." These facts, too, make the Uti case distinguishable from the instant matter.

disregarded disputed evidence in favor of labeling itself as a freight carrier. This alone, however, will not suffice.

In this case, for instance, Flying Cargo entered into several contractual agreements to deliver Mast's goods from Israel to Columbus, Ohio, "port to door." It issued the Bills of Lading for the Merchandise under a longstanding agreement with Danmar. Flying Cargo provided a dedicated account representative to Mast and engaged in regular communication and updates about the status of cargo transports. Flying Cargo invoiced Mast for the total cost of each such shipment. Flying Cargo was listed as the Shipper of the Goods on the Zim Bill of Lading. Whether these and other facts together require a conclusion that Flying Cargo deviated from its role as freight forwarder is not a matter that may properly be resolved on summary judgment. Flying Cargo may or may not be a freight forwarder whose liability may be limited to damages caused by its own negligence. *See United States v. American Union Transport*, 327 U.S. at 442-43. Neither party, however, has demonstrated that it is entitled to summary judgment on this issue. Accordingly, Plaintiffs' and Flying Cargo's Motions for Summary Judgment are on this basis **DENIED**.

Flying Cargo also contends that Plaintiffs are barred from asserting a claim that it was acting as a carrier pursuant to the one-year statute of limitations in the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* ("COGSA"). COGSA governs the carriage of international ocean shipments, including the one at issue here. Section 1303(6) of COGSA provides that a any lawsuit shall be commenced within one year after deliver of the goods in question, or one year from the date of the scheduled delivery. ("[T]he carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the

goods should have been delivered." 46 U.S.C. § 1303(6).)[5] The Complaint in this case was filed with the Franklin County Court of Common Pleas on June 10, 2004 against Danmar/Danzas, not Flying Cargo. Defendants jointly removed the case on July 16, 2004. While investigating the allegations contained in Danmar's Motion to Dismiss, Plaintiffs discovered that it had contracted with Flying Cargo for the carriage of their goods. As a consequence, Plaintiffs sought and were granted leave to amend the Complaint to add Flying Cargo, and to dismiss Danmar on October 15, 2004. Again, the loss at issue in this case occurred on June 13, 2003.

Federal Rule of Civil Procedure 15(c)(1) provides that an amendment to a pleading relates back to the date of the original pleading when:

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
  (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
  (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Relation back is dependent upon four factors:

(1) the basic claim must have arisen out of the conduct set forth in the original

---

[5] Tangentially, the Court notes that Flying Cargo objects, by way of its Motion for Leave to File a Sur-Reply, that Plaintiffs argued for the first time in their Reply that Flying Cargo is liable as a carrier and subject to COGSA. While Flying Cargo's Motion for Leave to File Sur-Reply (Doc. 101) is **GRANTED**, the Court wholly rejects as unfounded the premise that Flying Cargo was surprised by Plaintiffs' allegations that it is liable as a carrier under COGSA. Plaintiffs have questioned Flying Cargo's role in the transaction from the inception of the case, Flying Cargo itself has brought the issue to bear in its Eighth and Tenth Affirmative Defenses contained in its Answer to the Amended Complaint and in its various motions, and the Court has expressly discussed the disputed facts which prohibited judgment on the subject of whether it acted as a freight forwarder or a carrier in its previous rulings.

pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party must or should have known that, but for a mistake concerning identity, the action would have been brought against it; and (4) the second and third requirements must have been fulfilled within the prescribed limitations period.

*Schiavone v. Fortune*, 477 U.S. 21, 29 (1986).

Plaintiffs contend that Flying Cargo knew of should have known about the commencement of the action within the time for service. Plaintiffs point to an e-mail that Danzas forwarded to Flying Cargo on July 2, 2004 with a message stating that Plaintiffs' attorneys had previously advised that they had submitted their claim to Yosi Leeran at Flying Cargo. (Exh. A to Pls' Reply.)

The Court concludes that the running of the statute of limitations under COGSA in this case requires adjudication of issues of fact. The Court cannot determine from an unauthenticated email attached to a party's Reply memorandum that Flying Cargo had notice of the lawsuit, whether it was prejudiced in maintaining its defense; or whether it should have known that, but for a mistake concerning its identity, the action would have been brought against it rather than Danzas. *See Coate v. Montgomery County, Ky.*, 234 F.3d 1267, (Table), 2000 WL 1648131 (6th Cir. October 27, 2000)(unpublished)("Summary judgment should be granted if the action is clearly barred by the statute of limitations, but, if the running or tolling of the statute requires the adjudication of issues of fact, the motion should be denied." (internal quotations omitted).) Flying Cargo's Motion for Summary Judgment on statute of limitations grounds is therefore **DENIED**.

**B.     Palmer and Cargo Connections' Motions for Summary Judgment**

Both Palmer and Cargo Connections move for summary judgment on the Cross-Claims of Flying Cargo against them on the grounds that such claims are prohibited by the covenant not to sue

in the Bills of Lading,[6] or because the forum selection clause requires that any action be brought in Switzerland.[7] The Court has already ruled that Palmer and Cargo Connections may avail themselves of the liability limitations of the Himalaya Clause, as against the claims brought by Plaintiffs, the Merchant-Shipper in this case. Relying on the "law of the case" doctrine, Palmer and Cargo Connections contend that, as a result of the Court's previous Opinion and Order, a single factual issue remains unresolved, namely whether Flying Cargo acted as Plaintiffs' agent in entering

---

[6] Paragraph 6 of the reverse side of each Bill of Lading also provides as follows with respect to the issue of subcontracting:

- 6.1 In addition to the liberties given to the Carrier under the other clauses hereof, it is agreed that the Carrier shall be entitled to sub-contract on any terms the whole or any part of the carriage, loading, unloading, storing, warehousing, handling and any and all duties whatsoever undertaken by the Carrier in relation to the goods.

- 6.2 The expression sub-contractor in this clause shall include direct and indirect subcontractors, including stevedores and their respective servants and agents.

- 6.3 Himalaya Clause: For the purpose and subject to the provisions of this Bill of Lading, the Carrier shall be responsible for the acts and omissions of any person of whose services it makes use for the performance of the contract evidenced by this Bill of Lading. The Merchant undertakes that no claim or allegation shall be made against any person or vessel whatsoever, other than the Carrier. . . Without prejudice to the foregoing, all defenses and limitations of the Carrier shall be available to all persons of whose services the Carrier makes use for the performance of this contract. Such persons shall include, but shall not be limited to, the Carrier's servants or agents, independent contractors, including stevedores, terminal operators, carpenters, lashers, container repairmen, and all other persons of whose services the Carrier makes use in perform[ing] this contract . . . .

[7] Each Bill of Landing contains the following Jurisdiction and Law Clause:

The contract evidenced by or contained in this Bill of Landing id [sic] governed by the law of Switzerland and any claim or dispute arising hereunder or in connection herewith shall be determined by the courts of Basel-Stadt, Switzerland, and no other court.

into the written contracts, or whether Flying Cargo may avail itself, as a downstream carrier, of the liability limitations contained in the Himalaya Clause. Palmer and Cargo Connections contend that, regardless of the result of either of these inquiries, each is relieved of liability. They maintain that if, on the one hand, Flying Cargo was Plaintiffs' agent, it is prohibited from suing them in the same fashion as its principal, the Merchant-Shipper-Plaintiffs, by operation of the Himalaya Clause. If, on the other hand, Flying Cargo may avail itself of the liability limitations contained in the Clause as a downstream carrier, then its Cross-Claims against them are moot.

The Court disagrees that the law of the case doctrine limits the factual inquiry so narrowly as Palmer and Cargo Connections suggests. "The law of the case, like issue preclusion, or collateral estoppel, prevents the relitigation of an issue once there has been a judgment on the merits. Later disputes concerning that issue are considered foreclosed in any subsequent suit." *Bowles v. Russell*, 432 F.3d 668, 676 (6th Cir. 2005).

> The doctrine of the law of the case is similar [to issue preclusion] in that it limits relitigation of an issue once it has been decided, but the law of the case doctrine is concerned with the extent to which the law applied in decisions at various stages of the same litigation becomes the governing principle in later stages.

18 Moore's Federal Practice, § 134.20 (Matthew Bender 3d ed.). "The law of the case doctrine generally discourages courts from reconsidering determinations that the court made in an earlier stage of the proceedings." *United States v. Graham*, 327 F.3d 460, 464 (6th Cir.2003). The doctrine is "discretionary when applied to a coordinate court or the same court's own decisions." *Bowling v. Pfizer, Inc.*, 132 F.3d 1147, 1150 (6th Cir. 1998).

In this case, the Court never determined Flying Cargo's status with respect to the transportation of the stolen Merchandise. In fact, the Court has repeatedly deemed the record

insufficient to make such a determination regarding Flying Cargo's relationship with Mast. As it referred to the parties' various contentions in the underlying motions, the Court did question in its previous Order whether Flying Cargo acted within its authority as an agent for Mast, if in fact it was an agent, or whether it could take advantage of the covenant not to sue contained in the Himalaya Clause as against Plaintiffs' claims against them. Yet, the Court left for future disposition whether Flying Cargo was or was not acting as a mere freight forwarder.

Palmer and Cargo Connections' Motions are based on the application of the forum selection and covenant not to sue clauses contained in the Bills of Lading. Because Flying Cargo's role, still, is unclear with respect to its relationship with Mast, and, correspondingly, its obligations under the Bills of Lading which contain the clauses, the Court cannot assess the validity of its conditional Cross-Claims against Palmer and Cargo Connections. As Flying Cargo's status as a mere, uninvolved freight forwarder is disputed, and because questions of fact preclude summary judgment as to whether the terms and conditions of the Bills of Lading apply to Flying Cargo, the Court cannot determine whether Palmer and Cargo Connections may avail themselves of all the defenses and limitations they seek to employ in an effort to avoid liability.[8]

---

[8] Flying Cargo's Cross-claims essentially sound in common law contribution and indemnity. The Court notes that there is virtually no evidence in the record regarding the contracts for carriage or any other contractual relationships between Palmer and Flying Cargo, and Cargo Connections and Flying Cargo. The Court cannot, on the records before it, address the right and liabilities between these inland carriers and Flying Cargo.

-14-

## IV.

For the foregoing reasons, Palmer's Motion for Summary Judgment (Doc. #77) is **DENIED**; Cargo Connection's Motion for Summary Judgment (Doc. #94) is **DENIED**; Limited Brand's Motion for Summary Judgment (Doc. #95) is **DENIED**; and Flying Cargo's Motion for Summary Judgment (Doc. #96) is **DENIED**.

**IT IS SO ORDERED.**

<u>**February 27, 2008**</u>  
**DATED**

<u>/s/ *Edmund A. Sargus, Jr.*</u>  
**EDMUND A. SARGUS, JR.**  
**UNITED STATES DISTRICT JUDGE**